Kitt Carson HARRIS, Appellant,

v.

**CHESAPEAKE & OHIO RAILWAY COM-
PANY, ASHLAND, Kentucky, Appellee.**

Court of Appeals of Kentucky.

June 28, 1968.

Charles S. Sinnette, Ashland, for appellant.

Porter M. Gray, James Cooper, John M. Williams, Gray, Woods & Cooper, Ashland, J. D. Atkinson, Sr., Greenup, for appellee.

PALMORE, Judge.

The appellant, Harris, brought this action against his employer, Chesapeake & Ohio Railway Company, under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.[1] He appeals from a judgment entered pursuant to a jury verdict for the defendant company. He complains that the instructions were tantamount to a directed verdict against him. We agree, but have concluded that the company should have been granted a directed verdict anyway. Hence the instructions were not prejudicial.

---

1. "Every common carrier by railroad while engaged in commerce * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce * * * resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." 45 U.S. C.A. § 51.

In the early part of 1964, after Harris had been employed by the company for some 20 years, he developed a chronic case of contact dermatitis which began on his hands and then erupted on other parts of his body. He worked as a carman (or carmen) helper, sometimes referred to as an oiler and packer, at a place in the railroad yards called the wheel spot. Part of his job was to clean dirt and debris from journals and journal boxes, which required the use of a liquid detergent. The one that was being used at the time Harris's hands broke out, and had been used for some years, is a petroleum derivative called Valco 354, the trade name of its manufacturer. It is a straight-run 100% petroleum product derived from naphtha and is commonly known as mineral spirits. Other manufacturers of the same basic solvent market it under other names, such as Varsol (or Barsol) and Stanisol. It is in common use.

The theory of Harris's case is that his contact with this solvent is the cause of his present condition, which is attributable in whole or in part to the employer's negligence in failing to provide him a safe place and safe materials and equipment with which to work.

A dermatologist testified that in his opinion Harris has a sensitivity to Valco and that his condition probably resulted from repeated exposure to it in his work. He described a "sensitizer" as "something that maybe only one out of 100 will become sensitized to over a long period of time. This is the basic distinction between an allergic situation and a primary irritant, so here we have a substance, as far as this substance is concerned and this situation is concerned, it would not make any difference whether it's a primary irritant or an allergen, either way this man's trouble is in all probability caused by the Valco. * * * I would say in all probability that this is not a primary irritant because I don't think

it would be on the market. I don't think the C. & O. Railway would allow people to use it, and they would be out of business by now if it were a primary irritant."

The foregoing excerpt from the medical evidence adduced for Harris is important to the rationale of our decision in this case because we think the degree of care required of the railroad company depends on the danger involved. In terms of concrete facts, the precautions an ordinarily prudent employer would maintain for the protection of its employes in the use of a deadly substance such a hydrochloric acid are scarcely to be expected where the only reasonably foreseeable consequences are that a hypersensitive few may develop allergies.

The proof is that the company kept its men at the wheel spot supplied with goggles and rubber gloves and provided a washroom, showers and clothing lockers so that they might bathe and change clothes. A hand lotion called Protect was made available and was used by some of the men. Sometimes, however, the storeroom would be temporarily out of stock as to one or another of these supplies. Harris testified that a pair of gloves would last about a week before cracking open and that "sometimes I would go and they wouldn't have any." He said this happened twice in January and February of 1964, but did not indicate how often he was without gloves or for how long at a time he was usually required to work before the glove supply was replenished. Three fellow-employes gave about the same testimony,[2] and said also that on occasion, as when cleaning pistons in a vat, they had used the cleaning fluid without gloves and had experienced some amount of temporary skin irritation from it.

It was shown also that an air gun was used to syphon the cleaning fluid from a container and blow it into and on the journal boxes. This created a fog or vapor, and

---

2. One witness said, "They never would be in stock. Lots of times I have been to the storeroom and they wouldn't be in stock." However, he had done this type of work for 15 years, and over that length of time the expression "lots of times" is not very informative.

it was virtually impossible for the workman to avoid getting some of it on his skin.

The containers in which the cleaning agent is received bear the admonition, "Avoid excessive inhalation and avoid excessive skin contact." A medical witness for the railroad company, by way of discounting the fact that a patch test given Harris had shown him to be very sensitive to the solvent, said that much depends on how such a test is applied, and elaborated as follows: "Most men, and I'm sure the book here, if you want to take time to look it up, should not test for any solvent full strength because it will give almost anyone—A majority of people that have a patch test to a solvent like Barsol, if it is put on full strength and left on 24 or 48 hours, which you usually leave a patch test on, I could take all the people in this room and put Barsol on full strength and 50% of them I would expect to have some reaction to it."

When Harris reported his condition to his superior he was sent to a hospital for examination and treatment and was promptly assigned to a different kind of work.

In Cincinnati, New Orleans & Texas Pacific Railroad Co. v. Underwood (6th Cir. 1958), 262 F.2d 375, 74 A.L.R.2d 1025, the U. S. Court of Appeals for this circuit affirmed a verdict and judgment for personal injuries consisting in the main of contact dermatitis caused by exposure to creosote. As a criterion of the right to a jury determination the opinion quotes from Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 506, 509, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957), as follows: "Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer *negligence* played any part, even the slightest, in producing the injury or death for which damages are sought." (Emphasis added.)

■ The evidence in the *Underwood* case was considerably stronger than it is in this case. Among other things, the plaintiff in that case was subjected to exposure after

the company had been made aware of his condition. The facts stated in the opinion suggest that creosote may have been proved to be a "primary irritant" rather than a "sensitizer" as the two terms were contrasted by the medical witness for Harris in this case. It is common knowledge that most soaps and detergents have an abrasive effect and that any housewife will develop "dishwater hands" if she consistently exposes them to soapy water. If she has an allergic predisposition to it, she may suffer the same effects as Harris did. Knowing that constant or "excessive" contact of mineral spirits with the skin will produce irritation, the manufacturer warns against it and the railroad company supplies protective gloves and goggles to prevent it. These precautions are against *excessive* exposure, and it seems to us that they do not connote the existence of any danger from a normal use of the substance. Certainly the railroad company could not be found negligent merely in using this particular cleaning agent. If it was negligent at all, it can only have been in failing to provide reasonable safety devices. As we understand the medical evidence, the employe's condition probably built up over a period of many years, suddenly breaking out in 1964. We quote from the testimony of his medical witness as follows:

"In other words, it would be just like housewife dermatitis. You take the women that come in here, 10 or 12 of them a day, obviously they've been bathing all their life and maybe they've been married for five or six years and been using soapy water and so forth a great deal, and here after five or six years, or maybe a whole lifetime plus a married life of five or six years then they break out, and this is a sensitization. In other words, primary irritant, you break out the first time you use it, but with sensitization you can be in it 15 years or 18 years, whatever it was, and then suddenly become sensitized to it."

■ The evidence does not warrant a conclusion that anyone but the unusual,

atypical person with an allergic predisposition toward this particular solvent would have developed the condition from which Harris now suffers. Considering the problem from the standpoint of negligence and foreseeability, we do not believe the employer can reasonably be held to anticipate and provide against the abnormal. In the absence of proof that the normal, average person would be likely to develop contact dermatitis under similar conditions, the evidence that on sporadic occasions of unspecified number and duration the protective gloves were momentarily out of stock is not enough to ground a case of negligence. It must be remembered that Harris's fellow employes who experienced temporary skin irritations after using the solvent with bare hands—which is what the gloves were intended to prevent—did not develop contact dermatitis from it.

The judgment is affirmed.

All concur.